1  John D. Vaughn, State Bar No. 171801
   Christopher W. Rowlett, State Bar No. 257357
2  MCKENNA LONG & ALDRIDGE LLP
   4435 Eastgate Mall, Suite 400
3  San Diego, California 92121
   Telephone No.: (619) 595-5400
4  Fax No.: (619) 595-5450
   E-Mail:  jvaughn@mckennalong.com
5           crowlett@mckennalong.com

6
   Clifford V. Dunn, #933
7  [To be admitted *Pro Hac Vice*]
   Adam C. Dunn, #10926
8  [To be admitted *Pro Hac Vice*]
   DUNN LAW FIRM
9  110 West Tabernacle
   P.O. Box 2318
10 St. George, UT  84770
   Telephone Number: (435) 628-5405
11 Fax: (435) 628-4145
   E-Mail:  law@dunnfirm.com
12
   Attorneys for Plaintiff
13

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                              CV13-1228 JFW(MRWx)

17 R-LLC, LLC, an Idaho limited liability      **COMPLAINT FOR:**
   company,                                    **1) Federal Securities Fraud;**
18                                             **2) Violation of Federal Racketeer**
19          Plaintiff,                         **Influenced and Corrupt**
                                               **Organizations Act;**
20 v.                                          **3) California Securities Fraud;**
21                                             **4) Fraudulent Misrepresentation;**
   UMS CAPITAL GROUP, LLC, d/b/a               **5) Negligent Misrepresentations; and**
22 INSURANCE ANNUITYGROUP,                     **6) Breach of Fiduciary Duty**
   LLC, a Connecticut limited liability
23 company; JOSEPH A. MERMIS, an
   individual; XAVIER O. BARRIOS, an
24 individual; and C.M. SALAZAR, an
25 individual.
26

27          Defendant.

28

Plaintiff R-LLC, LLC (Plaintiff or R-LLC) alleges as follows:

### PARTIES

1.      Plaintiff R-LLC, LLC is a limited liability company (hereinafter "R-LLC") formed and existing under the laws of the state of Idaho, with its principal place of business in Idaho Falls, Idaho.

2.      UMS CAPITAL GROUP, LLC, d/b/a INSURANCE ANNUITY GROUP, LLC (hereinafter "UMS") is a limited liability company formed and existing under the laws of the state of Connecticut with its principal place of business at 102 Wolcott Road Suite G, Wolcott, Connecticut, 06716.

3.      JOSEPH A. MERMIS is an individual who, upon information and belief, is a resident of California and is the person who solicited the investment from Plaintiff, and is a manager and member of Defendant UMS.

4.      XAVIER O. BARRIOS is an individual who, upon information and belief, is a resident of California and is a manager and member of Defendant UMS and upon information and belief was a signor on the bank account of Defendant UMS.

5.      C.M. SALAZAR is an individual who, upon information and belief, is a resident of Nevada and upon information and belief was a signor on the bank account of Defendant UMS.

6.      UMS, Mermis, Barrios, and Salazar are referred to herein collectively as "Defendants."

7.      Plaintiff is informed and believes, and based thereon alleges, that at all times herein mentioned, Defendants and each of them were the agents, servants, co-conspirators, partners, representatives, or employees of each of the other Defendants, and were acting at all times either individually or within the course and scope of such capacity and authority, and with the advance knowledge, consent, permission, acquiescence, and express or implied ratification of the remaining Defendants such that the actions of any defendant can be attributed to all other Defendants.

8.      Plaintiff is informed and believes, and based thereon alleges, that Defendants, and each of them, were the alter egos of each of the other Defendants. Plaintiff is further informed and believes, and based thereon alleges, that there exists, and at all times relevant herein existed, a unity of interest and ownership between them such that any individuality and separateness between these Defendants had ceased, and that said Defendants intermingled the assets of each to suit their convenience. Plaintiff is informed and believes, and based thereon alleges, that adherence to the fiction of the separate existence of these Defendants as distinct individuals and/or entities would sanction fraud and promote injustice.

## VENUE AND JURISDICTION

9.      R-LLC invested approximately $2,300,000 in Defendant UMS in or about July 2009.

10.     Various agreements entered into at the time of the investment dictated, in essence, that "[e]ach of the Parties hereto irrevocably consents to the exclusive jurisdiction of the federal and state courts located in Los Angeles and Orange Counties, California over any dispute arising out of or relating to this Agreement...." (See, e.g., Series A Investment Agreement dated May 14th, 2009.) A true and correct copy of the Series A Investment Agreement is attached hereto as Exhibit A and incorporated herein by reference.

11.     Complete diversity exists between plaintiff and defendants. As alleged herein, Plaintiff is a resident of Idaho.   It was formed under the laws of the state of Idaho and maintains its principal place of business there. Defendants are residents California (Mermis and Barrios), Nevada (Salazar), and Connecticut (UMS).

12.     Causes of action asserted herein arise under federal statutes and regulations, specifically 17 C.F.R. section 240.10 *et seq.* and 18 U.S.C. section 1962.

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 and 28 U.S.C. section 1332.

14.     Venue properly lies in this Court under 28 U.S.C. section 1391.

## GENERAL ALLEGATIONS

15.   In or about the Spring of 2009, Defendants began soliciting investment funds from R-LLC and/or its members.

16.   Mermis represented to R-LLC and/or its authorized representatives that he located significant numbers of annuity contracts that were "lying in the street ready to be plucked up".

17.   Mermis represented to R-LLC and/or its authorized representatives that he needed funds to purchase an insurance company so that his company, UMS, could have licensure sufficient to purchase annuity contracts.

18.   Mermis represented to R-LLC and/or its authorized representatives that upon purchasing said insurance company that he could readily purchase annuity contracts and that upon purchasing these annuity contracts, that he could provide real estate bridge loans on various projects throughout the United States.

19.   Mermis represented to R-LLC and/or its authorized representatives that he had already located an insurance company called Shenandoah, which was located in Virginia.

20.   Mermis represented to R-LLC and/or its authorized representatives that upon purchase of Shenandoah, that UMS would have sufficient resources to begin real estate loans and to begin aggressively pursuing the plethora of annuities available.

21.   Mermis represented to R-LLC and/or its authorized representatives that he had located an investor who was willing to match the investment by R-LLC and invest at least $2,300,000.

22.   Based on the representations of Mermis as the manager of UMS, R-LLC agreed to invest approximately $2,300,000 with UMS in or about July, 2009.

23.   Upon information and belief, these representations by Mermis and/or UMS, and others made after this time, were false and were known or should have been known by Mermis and/or UMS to be false when they were made.

24.   In or about May 2009, and as part of the investment in UMS, R-LLC

entered into a "Designation of Account Agreement" which stated the funds invested by R-LLC would only be used to purchase an "Insurance Company" or repaid directly to R-LLC. (Designation of Account Agreement, p. 2.)  A true and correct copy of the Designation of Account Agreement is attached hereto as Exhibit B and incorporated herein by reference.

25.    The "Designation of Account Agreement" stated that "Joe Mermis and/or UMS shall be the sole authorized signatory on the Designated Account authorized to make any withdrawal or transfer from the Designated Account" and the funds invested by R-LLC were to only be held in the "Designated Account". (Ex. B, pp. 1-2.)

26.    Also in May 2009, R-LLC and UMS entered into the Security Agreement, a true and correct copy of which is attached hereto as Exhibit C and incorporated herein by reference.

27.    In or about the beginning of July, 2009, Mermis and/or UMS represented to R-LLC and/or its authorized representatives that he had located an insurance company and, with the investment from R-LLC, that he could close on the purchase of that insurance company by September 16, 2009.

28.    In or about July 7, 2009, R-LLC agreed to a modification of its earlier agreement with UMS and Mermis wherein the funds invested by R-LLC would only be used by UMS for the "Acquisition of the Workmen's Life Insurance Company, an Arizona life insurance company" or "Start Up Operating Expenses of IAG, including but not limited to hiring or retaining an actuary, consultant, board members and other necessary expenses for the state of operations."  A true and correct copy of the July 7, 2009 Letter Agreement is attached hereto as Exhibit D.

29.    R-LLC understood that the Arizona based Workmen's Life Insurance Company was the company that Mermis believed he could purchase by September 16th, 2009.

30.    The July 7, 2009 Letter Agreement did not amend or alter who was authorized to be a signatory on the account where the funds invested by R-LLC were to

be held.

31.    The July 7, 2009 Letter Agreement stated that Robert Keys would invest $2,500,000 with UMS on or about July 17, 2009. (Ex. D, p. 2.)

32.    The July 7, 2009 Letter Agreement also imposed on Defendants Mermis and UMS certain accounting and reporting obligations including but not limited to providing budgets, invoices, and other accounting information. (Ex. D, p. 2.)

33.    R-LLC invested approximately $2,300,000 dollars with Mermis and UMS and received 2,500,000 units of ownership in UMS.

34.    As part of the investment, R-LLC was to receive 12% on the investment and a full return of principal within 12 months.

35.    Mermis, UMS, and Barrios each also received ownership in UMS.

36.    Upon information and belief, Mermis, UMS, and Barrios never invested any funds in UMS.

37.    Upon information and belief, the funds invested by R-LLC were put into an account controlled by Mermis, UMS, Barrios, and Salazar as signatories.

38.    Upon information and belief, Keys never invested the $2,500,000 that was referenced in the July 7, 2009 Letter Agreement.

39.    In or about August, 2009, Mermis represented that even without the investment from Keys, he could make UMS work.

40.    Mermis represented that he still needed additional funds, but that at that time, the investment from R-LLC would be sufficient to begin the acquisition of various insurance companies.

41.    At that time, Mermis represented that he was still trying to close the purchase of Workmen's Life Insurance Company (hereinafter "Workmen's") in Arizona and Shenandoah in Virginia.

42.    Mermis represented that either company would provide UMS the required licensure to begin acquiring the annuities that Mermis believed were so readily available.

43.  During this time, Mermis continued to represent to R-LLC and/or its authorized representatives that UMS would be acquiring an insurance company and begin acquiring annuity contracts "soon".

44.  About this time, Mervyn Phelan and Greg Grantham began working with Mermis and UMS in order to locate opportunities for UMS.

45.  On or about October 24, 2009, Phelan communicates with R-LLC and states that he received word from Mermis that UMS had done a deal involving a portion of an insurance company that would allow for licensure of UMS and for acquisitions of annuity contracts to begin.

46.  On or about November 24, 2009, Grantham communicated that Shenandoah was being purchased by another company and that UMS was not purchasing that insurance company.  Mermis and/or UMS contradict this and again assures R-LLC that the purchase of an insurance company is imminent.

47.  In or about December 2009, R-LLC verbally agrees to allow UMS an additional 12 months to repay the principal balance owing on the investment made by R-LLC.  This agreement modifies the earlier investment contract and allows UMS until June, 2011 to repay the principal amount invested by R-LLC together with interest.

48.  At this time, Mermis and/or UMS continued to represent to R-LLC that the purchase of both Shenandoah and Workmen's was imminent.

49.  On or about December 29, 2009, Mermis and/or UMS represents that UMS has sufficient funds to purchase Shenandoah, but that it is still awaiting additional investment dollars to purchase Workmen's.

50.  On or about December 30, 2009, Grantham informed Mermis and UMS that Grantham and/or Phelan had located an investor who was willing to borrow $2,500,000 from a bank in order to invest that in UMS; the condition however was that the investor wanted proof from UMS that the funds would be returned quickly.

51.  In or about the beginning of January, 2010, Mermis represented that attorneys of UMS were going to meet with attorneys from Shenandoah on or about

January 10, 2010; presumably to arrange for the purchase and closing of Shenandoah.

52.   Upon information and belief, this meeting never took place, or, if it did, was not for the purposes stated by Mermis.

53.   In or about the beginning of February, 2010, Mermis represented to R-LLC that the closing for Shenandoah was three to five weeks away and that Workmen's should close by mid to late February.

54.   At or about this time, Mermis begins to represent that Jim Freeman had approximately $500 million worth of annuities that would be "parked" with UMS.

55.   Mermis represented that Jim Freeman had amassed 56,000 names of government workers in California who all held annuities; Mermis represented that UMS would manage these annuities upon purchasing an insurance company or upon using the license of another insurance company.

56.   At this time, Mermis represents that he needs an additional $1,500,000 in order to pay for and "park" the 56,000 annuities with UMS or an affiliate.

57.   On or about February 17, 2010, Greg Grantham informs Mermis and UMS that, upon information and belief, he thought Jim Freeman had been convicted of fraud in 1996 for running a $26 million ponzi scheme.

58.   On or about February 23, 2010, UMS tells R-LLC that UMS needs an additional $140,000 to close the purchase of Shenandoah.

59.   On or about June 6, 2011, counsel for R-LLC demanded return of the $2,300,000 invested in UMS and agreed to be repaid no later than June, 2011.

60.   Mermis responded to the demand by stating that the UMS project has been "delayed" and that before they were looking for "$5 million in financing, the figure being negotiated is now 20 times that amount in the US, and 20 times that in China."

61.   Mermis also represented to Counsel for R-LLC that it was his intention and the intention of UMS to "be in touch with over [sic] the next 20 to 90 days to settle" the investment.

62.   Upon information and belief, the representations of Mermis and UMS

1  made after the investment by R-LLC were false and were known to be false or should

2  have been known to be false by Mermis and UMS.

3       63.    To date, neither Mermis nor UMS has repaid the investment by R-LLC to

4  R-LLC.

## LEGAL CLAIMS

## FIRST CAUSE OF ACTION

### (Federal Securities Fraud as to UMS, Mermis, and Barrios)

8       64.    Plaintiff realleges and incorporates each and every allegation made above

9  as if fully set forth herein.

10      65.    17 C.F.R. 240.10b-5(a) prohibits any "device, scheme or artifice to

11  defraud" in connection with the purchase or sale of a security. 17 C.F.R. 240.10b-5(b)

12  provides that it is a fraudulent practice to offer or sell securities by making "any untrue

13  statement of fact" or "omit[ting] to state any material fact necessary in order to make

14  the statements made, in light of the circumstances under which they were made, not

15  misleading." 17 C.F.R. 240.10b-5(c) makes it unlawful to "engage in any transaction,

16  practice or course of business which operates or would operate as a fraud or deceit."

17      66.    In soliciting R-LLC, Mermis and UMS intentionally and/or recklessly

18  misled and defrauded R-LLC in connection with its investment in UMS by, among

19  other things, misrepresenting opportunities that UMS had regarding the purchase of

20  certain insurance companies, availability of annuities, availability of funds to purchase

21  said annuities or companies, and how invested funds would be used.

22      67.    In addition, Defendants failed to disclose the material risks associated with

23  the investment including that Keys may or may not invest the additional $5,000,000,

24  what would happen without those funds, and that the company could not purchase

25  certain assets without significantly more funds than R-LLC contributed.

26      68.    In addition, after funds were invested by R-LLC, Mermis and UMS

27  continued to make misrepresentations regarding opportunities, purchases of insurance

28  companies, and third-Party investment in UMS.

69.     Both Mermis and Barrios were and are Managers of UMS and participated and aided in the violation of 17 C.F.R. 240.10b-5 by soliciting Plaintiff's investment, and through their management and ownership of UMS.

70.     In addition, Mermis and Barrios, together with UMS, participated and aided in the violation of 17 C.F.R. 240.10b-5 through their affiliation with UMS and their false promises made in the investment documents and after R-LLC invested in UMS.

71.     The representations and omissions made by Defendants are and/or were material to R-LLC's determination to invest in UMS.

72.     But for the misrepresentations, omissions, and/or actions of UMS, Mermis, and Barrios, R-LLC would not have invested the $2,300,000 that has not been repaid and therefore, the damage that R-LLC has suffered is the direct and proximate result of the conduct of UMS, Mermis, and Barrios that violated 17 C.F.R. 240.10b-5.

73.     Given the violations of 17 C.F.R. 240.10b-5 alleged herein, Plaintiff is entitled to rescission of its investment, or in the alternative damages, with interest accruing thereon at 12%, or the contract rate and attorney's fees and costs, in an amount to be proven at trial.

74.     Upon information and belief, Mermis and UMS intentionally, willfully, and with malicious intent violated the federal rule.  They intentionally and fraudulently misrepresented their ability to acquire the necessary funds, purchase the insurance companies/licenses, and purchase the annuities, all as part of an intentional plan to defraud Plaintiff of $2,300,000.  Consequently, they are liable for punitive damages.

## SECOND CAUSE OF ACTION

### (Violation of Federal RICO as to UMS, Mermis, and Barrios)

75.     Plaintiff realleges and incorporates each and every allegation made above as if fully set forth herein.

76.     Upon information and belief, UMS, Mermis, and Barrios solicited additional funds for UMS from multiple parties.

77.    Violation of 17 C.F.R. 240.10b-5 by UMS, Mermis, and Barrios constituted a pattern of racketeering activity in which they or all of them acquired or maintained an interest in or control of an enterprise which is violating 18 U.S.C. section 1962.

78.    Given the pattern of violations of 17 C.F.R. 240.10b-5 alleged herein, Plaintiff is entitled to rescission of its investment, or in the alternative damages, together with treble damages with interest accruing thereon at 12%, or the contract rate and attorney's fees and costs, in an amount to be proved at trial.

## THIRD CAUSE OF ACTION

### (California Securities Fraud as to UMS, Mermis, and Barrios)

79.    Plaintiff realleges and incorporates each and every allegation made above as if fully set forth herein.

80.    The agreements controlling the sale of securities by UMS to R-LLC, the Designation of Account Agreement, the Security Agreement, and the Series A Investment Agreement, are all governed by California law.

81.    California Corporations Code, section 25400 *et seq.*, prohibits any "device, scheme or artifice to defraud" in connection with the purchase or sale of a security, provides that it is a fraudulent practice to offer or sell securities by making "any untrue statement of material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," and makes it unlawful to "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

82.    In soliciting R-LLC, Defendants intentionally and/or recklessly misled and defrauded R-LLC in connection with its investment in UMS by, among other things, misrepresenting opportunities that UMS had regarding the purchase of certain insurance companies, availability of annuities, availability of funds to purchase said annuities or companies, and how invested funds would be used.

83.    In addition, Defendants failed to disclose the material risks associated with

1  the investment including that they could not secure the additional $5,000,000 from

2  outside investors, what would happen without those funds, and that UMS could not

3  purchase certain assets without significantly more funds than R-LLC contributed.

4      84.    In addition, after funds were invested by R-LLC, Defendants continued to

5  make misrepresentations regarding opportunities, purchases of insurance companies,

6  and third-party investment in UMS.

7      85.    Both Mermis and Barrios were and are Managers of UMS and participated

8  and aided in the violation of California law by soliciting Plaintiff's investment, and

9  through their management and ownership of UMS.

10     86.    In addition, Mermis and Barrios, together with UMS participated and

11 aided in the violation of California law through their affiliation with UMS and their

12 false promises made in the investment documents and after R-LLC invested in UMS.

13     87.    The representations made or omissions that were perpetrated by

14 Defendants are and/or were material to R-LLC's determination to invest in UMS.

15     88.    But for the misrepresentations, omissions, and/or actions of UMS, Mermis,

16 and Barrios, R-LLC would not have invested the funds that have not been repaid and

17 therefore, the damage that R-LLC has suffered is the direct and proximate result of the

18 conduct of UMS, Mermis, and Barrios that violated the California Corporate Securities

19 Law of 1968.

20     89.    Given the violations of the California Corporate Securities Law of 1968

21 alleged herein, Plaintiff is entitled to rescission of its investment, or in the alternative

22 damages, with interest accruing thereon at the legal rate, or the contract rate and

23 attorney's fees and costs, in an amount to be proved at trial.

24     90.    Mermis and UMS intentionally, willfully and maliciously misrepresented

25 their ability to acquire the necessary funds, purchase the insurance companies/licenses,

26 and purchase the annuities, all as part of an intentional plan to defraud Plaintiff of

27 $2,300,000. Consequently, they are liable for punitive damages.

28

## FOURTH CAUSE OF ACTION

### (Fraudulent Misrepresentation as to UMS and Mermis)

91.     Plaintiff realleges and incorporates each and every allegation made above as if fully set forth herein.

92.     Mermis and UMS made a series of misrepresentations, as identified above, before and after R-LLC invested in UMS.

93.     Those representations were, at the time they were made, about material facts that were false.

94.     Mermis and UMS knew the representations were false, and/or made the statements recklessly knowing they did not have sufficient information or knowledge to make such representations.

95.     Mermis and UMS made the above referenced misrepresentations for the purpose of inducing R-LLC to invest approximately $2,300,000 in UMS, and delaying any action by R-LLC to seek reimbursement of the funds.  R-LLC acted reasonably in relying on the representations of Mermis and UMS, was thereby induced into investing in UMS, and has been damaged as a result because the investment has not been returned to R-LLC nor has it received interest payments.

96.     Mermis and UMS intentionally, willfully and maliciously misrepresented their ability to acquire the necessary funds, purchase the insurance companies/licenses, and purchase the annuities, all as part of an intentional plan to defraud Plaintiff of $2,300,000.  Consequently, they are liable for punitive damages.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation as to UMS and Mermis)

97.     Plaintiff realleges and incorporates each and every allegation made above as if fully set forth herein.

98.     Mermis and UMS made a series of misrepresentations, as identified above, both before and after R-LLC invested in UMS.

99.     Those representations were, at the time they were made, about a material

1   fact that was false.

2        100.   Mermis and UMS should have known the representations were false,

3   and/or should not have made the statements knowing that they did not have sufficient

4   information or knowledge to make such representations.

5        101.   Mermis and UMS negligently made the misrepresentations, which were

6   made for the purpose of inducing R-LLC to invest approximately $2,300,000 in UMS,

7   and delaying any action R-LLC might take to recover the funds it invested in UMS.

8   R-LLC acted reasonably in relying on the representations of Mermis and UMS, was

9   thereby induced into investing in UMS, and has been damaged as a result because the

10  investment has not been returned to R-LLC nor has it received interest payments.

11                       **SIXTH CAUSE OF ACTION**

12            **(Breach of Contract as to UMS and Mermis)**

13       102.   Plaintiff realleges and incorporates each and every allegation made above

14  as if fully set forth herein.

15       103.   Mermis and UMS made valid and binding agreements with R-LLC related

16  to the $2,300,000 investment by R-LLC in UMS.   This includes the Series A

17  Investment Agreement, the Security Agreement, the Letter Agreement and the

18  Designation of Account Agreement (collectively the "Agreements"). The Agreements

19  are attached hereto as Exhibits A through D, and the express terms of which are

20  incorporated herein by reference.

21       104.   R-LLC performed all obligations, promises, covenants and conditions

22  required of it under the Agreements, except those obligations, covenants and conditions

23  as to which its performance has been excused.

24       105.   Mermis and UMS breached numerous obligations under the Agreements

25  between the parties including but not limited to (a) failing to use the funds invested by

26  R-LLC for the purchase of an insurance company; (b) using the funds invested by

27  R-LLC for purposes explicitly prohibited by the Agreements; (c) allowing additional

28  signors on the account holding the funds invested by R-LLC; (d) failing to provide

1   accounting and reports as required by the agreement related to the funds invested by

2   R-LLC; and (e) failing to repay the funds invested by R-LLC, together with interest, as

3   agreed.

4       106.   As a direct and proximate result of Defendants' breach of contract, R-LLC

5   was damaged in an amount to be proven at trial, but at least in excess of the $2,300,000

6   plus interest it invested in UMS.

7       107.   Pursuant to paragraph 14 of the Account Agreement R-LLC will seek its

8   reasonable attorney's fees and costs associated with this action.

9   **SEVENTH CAUSE OF ACTION**

10   **(Breach of Fiduciary Duty as to Mermis and Barrios)**

11       108.   Plaintiff realleges and incorporates each and every allegation made above

12   as if fully set forth herein.

13       109.   R-LLC currently owns 2,500,000 units of ownership in UMS. Mermis and

14   Barrios are the designated Managers of UMS, and in that capacity owe R-LLC a

15   fiduciary duty as a member.

16       110.   Defendants Mermis and Barrios have breached their fiduciary duties to

17   Plaintiff R-LLC, by, among other things, failing to use funds invested by R-LLC in

18   accordance with the agreements between UMS and R-LLC, failing to return the

19   invested funds as obligated, and allowing a non-member/non-manager of UMS as a

20   signer on the account where the funds invested by R-LLC were held.

21       111.   Upon information and belief, Mermis, Barrios and Salazar were all joint

22   signers on the account of UMS where the funds invested by R-LLC were held.

23       112.   As signatories on that account, Mermis, Barrios and Salazar knew or

24   should have known that those funds were invested by R-LLC, could only be used in

25   accordance with the explicit agreements of UMS and R-LLC, and that they owed a duty

26   to R-LLC to only act in accordance with those agreements.

27       113.   As signatories on that account, Mermis, Barrios and Salazar allowed the

28   funds invested by R-LLC to be used for purposes other than those stated and agreed to

by R-LLC and breached their duty and obligation to R-LLC to oversee those funds and that account in a prudent and appropriate manner.

114.    As a direct and proximate result of Mermis and Barrios' violations of their fiduciary duties as set forth herein, R-LLC has been damaged in an amount to be proven at trial but in no event less than the $2,300,000 R-LLC invested in UMS plus interest at the maximum legal rate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

1.    For damages in an amount to be determined at trial, but in no event less than $2,300,000 plus interest;

2.    For punitive damages;

3.    For pre-judgment interest according to law;

4.    For reasonable attorney's fees, and other costs accrued in bringing this action; and,

5.    For such other and further relief as this court deems fair and equitable under the circumstances.

DATED: February 20, 2013        **MCKENNA, LONG, & ALDRIDGE LLP**

By: _____
JOHN D. VAUGHN
CHRISTOPHER W. ROWLETT
Attorneys for Plaintiff

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues stated.

DATED: February 20, 2013    **MCKENNA, LONG, & ALDRIDGE LLP**

By: _____

JOHN D. VAUGHN
CHRISTOPHER W. ROWLETT
Attorneys for Plaintiff

803546316.3

# EXHIBIT "A"

Insurance Annuity Group, LLC
Series A Investment Agreement

This Series A Investment Agreement (this "**Agreement**") is entered into as of this _____ day of May, 2009 (the "**Effective Date**"), by and between INSURANCE ANNUITY GROUP, LLC, a Connecticut limited liability company (the "**Company**"), and R-LLC, LLC, an Idaho limited liability company (the "**Investor**"), with reference to the following facts:

A.    Concurrently with the entry into this Agreement, the Investor is purchasing 2,500,000 Series A Units (the "**Series A Units**") and entering into that certain Operating Agreement of Insurance Annuity Group, LLC (the "**Operating Agreement**").

B.    The Investor wishes to provide for the return of capital from such investment in the Company and has therefore asked that the Company enter into this Agreement with the Investor as a condition to such investment.

C.    The Company is willing to do so under the terms set forth below.

NOW, THEREFORE, in consideration of the foregoing, the Investor's purchase of the Series A Units, the mutual covenants and agreements set forth herein, and other good and valuable consideration, the parties hereto agree as follows:

1.    <u>Grant of Option</u>.  The Company hereby grants to the Investor an option (the "**Option**") to receive the return of its "Unreturned Capital Contribution" (as defined in the Operating Agreement) upon demand made by notice to the Company at any time between twelve (12) months following the Effective Date through the expiration of fourteen (14) months following the Effective Date.

2.    <u>Delivery of Capital Contribution</u>.  Upon the exercise of the Option, the Company shall pay to the Investor the balance of the Investor's Unreturned Capital Contribution in cash within fourteen (14) days of receipt of notice of the exercise of the Option.

3.    <u>Effect on Capital Account and Units</u>.  The amount of cash paid to the Investor pursuant to Section 2 above shall be deducted from the Investor's Capital Account in accordance with the Operating Agreement.  The Investor's exercise of the Option and the Company's return of the Unreturned Capital Contribution shall have no effect on the Investor's ownership of the Series A Units and conversion rights as a holder of Series A Units.

4.    <u>Miscellaneous</u>.

(a)    <u>Governing Law and Jurisdiction</u>.  This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California.  If any California law or laws shall require or permit the application of the laws of any other jurisdiction to this Agreement, such California law or laws shall be disregarded with the effect that the remaining laws of the State of California shall nonetheless be applied.  Each of the parties hereto irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Los Angeles and Orange Counties, California over any dispute arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such court, such personal jurisdiction shall be non-exclusive.

286,402,000-2

(b)   Binding Effect.  This Agreement shall be binding upon the Company and the successors and assigns of the Company, and shall inure to the benefit of the Investor and the heirs, successors, assigns, executors, administrators and personal or legal representatives of the Investor.

(c)   Severability.  In the event that any one or more of the provisions contained in this Agreement are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

(d)   Amendment and Waiver.  No term of this Agreement may be amended and no observance of any term of this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), without the written consent of the party against which such amendment or waiver is sought to be enforced.

(e)   Notices, etc.  All notices and other communications required or permitted hereunder shall be effective if in writing and delivered personally or sent by telecopier, a well-recognized overnight courier service or registered or certified mail, return receipt requested, postage prepaid, addressed:

If to the Investor:          R-LLC, LLC
                             1070 Riverwalk Dr., Suite 200
                             Idaho Falls, Idaho 83402
                             Attn:  Keith T. Walker

If to the Company, to:       Insurance Annuity Group, LLC
                             102 Wolcott Road, Suite G
                             Wolcott, Connecticut  06716
                             Attn:  Joseph A. Mermis

Unless otherwise specified herein, such notices or other communications shall be deemed effective (a) on the date delivered, if delivered personally, by facsimile or electronically with confirmation of good transmission and receipt, (b) one business days after being sent, if sent by a well-recognized overnight courier service, and (d) three business days after being sent, if sent by registered or certified mail, postage prepaid, return receipt requested.  Each of the parties herewith shall be entitled to specify another address by giving notice as aforesaid to each of the other.

(f)   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

Executed as of the date first above written.

INSURANCE ANNUITY GROUP, LLC          R-LLC, LLC
a Connecticut limited liability company   an Idaho limited liability company

By: _Joseph A. Mermis_                By: _____
Name: _Joseph A. Mermis_              Name: _Keith T. Walker_
Its: _Manager_                        Its: _Authorized Representative_

286,402,800 -2

(b)    Binding Effect.  This Agreement shall be binding upon the Company and the successors and assigns of the Company, and shall inure to the benefit of the Investor and the heirs, successors, assigns, executors, administrators and personal or legal representatives of the Investor.

(c)    Severability.    In the event that any one or more of the provisions contained in this Agreement are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

(d)    Amendment and Waiver.  No term of this Agreement may be amended and no observance of any term of this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), without the written consent of the party against which such amendment or waiver is sought to be enforced.

(e)    Notices, etc.  All notices and other communications required or permitted hereunder shall be effective if in writing and delivered personally or sent by telecopier, a well-recognized overnight courier service or registered or certified mail, return receipt requested, postage prepaid, addressed:

If to the Investor:              R-LLC, LLC
                                 1070 Riverwalk Dr., Suite 200
                                 Idaho Falls, Idaho 83402
                                 Attn: Keith T. Walker

If to the Company, to:           Insurance Annuity Group, LLC
                                 102 Wolcott Road, Suite G
                                 Wolcott, Connecticut 06716
                                 Attn: Joseph A. Mermis

Unless otherwise specified herein, such notices or other communications shall be deemed effective (a) on the date delivered, if delivered personally, by facsimile or electronically with confirmation of good transmission and receipt, (b) one business days after being sent, if sent by a well-recognized overnight courier service, and (d) three business days after being sent, if sent by registered or certified mail, postage prepaid, return receipt requested.  Each of the parties herewith shall be entitled to specify another address by giving notice as aforesaid to each of the other.

(f)    Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

Executed as of the date first above written.

INSURANCE ANNUITY GROUP, LLC          R-LLC, LLC
a Connecticut limited liability company   an Idaho limited liability company

By:_____          By:_____
Name:  Joseph A. Mermis               Name:  Keith T. Walker
Its: ____ Manager                     Its: ____ Authorized Representative

-2-

286,402,800 -2

EXHIBIT "B"

## DESIGNATION OF ACCOUNT AGREEMENT

This DESIGNATION OF ACCOUNT AGREEMENT (the "Agreement") is entered into effective as of May _____, 2009, by and among **UMS CAPITAL GROUP LIMITED, LLC**, a Connecticut limited liability company, d/b/a Insurance Annuity Group, LLC (the "**Company**"), and **R-LLC, LLC**, an Idaho limited liability company and **ULTIMATE ALLIANCE, LLC**, a Nevada limited liability company (collectively, the "**Investors**"), with reference to the following recitals:

A.      The Company is governed by that certain Operating Agreement of Insurance Annuity Group, LLC, a Connecticut limited liability company, dated _____, 2009 (the "Operating Agreement").

B.      Concurrently with the entry into this Agreement, each Investor is entering into a Subscription Agreement with the Company to purchase 2,500,000 Series A Units respectively (collectively, the "**Subscription Agreements**") and entering into the Operating Agreement as a Series A Member of the Company, pursuant to which the Investors are contributing $5,000,000 in cash (the "**Cash Contribution**") to the Company.

C.      As a condition to the Subscription Agreement and making the Cash Contribution, the Investors have required that the Cash Contribution be deposited, held and disbursed by the Company in accordance with this Agreement.

D.      The Operating Agreement and Subscription Agreement provide for the Company's use of up to Three Million Five Hundred Thousand Dollars ($3,500,000) of the Cash Contribution (the "**Designated Funds**") to acquire a licensed insurance company (the "**Insurance Company**").

E.      Concurrently with the execution of this Agreement and the Cash Contribution, the Investor and the Company have entered into an Insurance Annuity Group, LLC Series A Investment Agreement, pursuant to which the Company granted to the Investor an option to receive the return of its Unreturned Capital Contribution following twelve months of its investment (the "**Option**").

F.      The Investors and the Company desire to provide for the Company's use of the Cash Contribution and the Company's reporting to Investors of the use of the Cash Contribution.

NOW THEREFORE, for and in consideration of the foregoing and the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Investors (each, a "**Party**" and collectively as the "**Parties**") hereby agree as follows:

1.      Deposit Delivery. The Company is hereby authorized and directed to open and utilize the deposit account in the name of the Company and identified on Exhibit "A" attached hereto and incorporated herein, in order that the Company may carry out its obligations pursuant to this Agreement (the "**Designated Account**"). On the execution and delivery of this Agreement by all Parties, the Investors shall deliver or cause to be delivered the Cash Contribution to the Company by wire transfer to the Designated Account. The total amount thus deposited and all interest earned thereon shall hereinafter be referred to as the "**Deposit.**" All interest accruing on the Deposit shall be added to and become a part of the Deposit. The Deposit Account shall be held in trust by the Company for the benefit of the Company and the Investor as their interest in such Deposit are set forth in this Agreement. The Designated Funds shall be held and disbursed by the Company only in accordance with this Agreement, or as may otherwise be directed in a writing duly executed by the Investor. The balance of the Cash Contribution may be used by the Company in accordance with the use of proceeds set forth in the Offering Circular delivered to Investors in connection with the Subscription Agreement. The Cash Contribution shall be credited to the Investor's Capital Account pursuant to the Operating Agreement upon delivery of the Cash Contribution to the Company. Any interest earned thereon shall be income to the Company and shall not be deemed to be a part of the Investors' Capital Contribution to the Company.

OC286,402,970v5

2.  Term.  The term of this Agreement shall commence on the execution and delivery of this Agreement and shall terminate upon the return of the Investors' Unreturned Capital Contributions in accordance with the Operating Agreement (the "Term").

3.  Use of Designated Funds.  The Designated Funds shall be disbursed only as follows:

(a) Upon notice from the Company to the Investor of the closing of the Company's acquisition of the Insurance Company within six (6) months of the Effective Date, the Designated Funds may be paid to the seller of the Insurance Company on behalf of the Company in the amount of the total purchase price due seller (up to the amount of the Designated Funds), and thereafter the balance of the Designated Funds, if any, to third-parties as otherwise directed by the Company; or

(b) On the first business day following six (6) months after the Effective Date, the Designated Funds plus the balance of the Deposit to Investors by wire transfer to a bank account or bank accounts as may be directed by the Investors. All funds received by the Investors pursuant to this paragraph shall be credited by the Company against the Investors' accrued but unpaid Preferred Return (as defined in the Operating Agreement) and then to the Investors' Unreturned Capital Account (as defined in the Operating Agreement), in proportion to their respective account balances.

4.  Authorized Signatory.  Joe Mermis shall be the sole authorized signatory on the Designated Account authorized to make any withdraw or transfer from the Designated Account.

5.  Monthly Reports.  Within five (5) days of receipt of the monthly bank statements for the Designated Account (the "Bank Statement"), the Company shall deliver to Investors: (a) a complete copy of the Bank Statement, and (b) list of the name and address of all payees, if any, of any disbursements from the Designated Account during the period covered by the Bank Statement and the purpose of each such disbursement.

6.  Investor Access to Records.  The Company shall authorize Investors to view electronically at any and all times all of the bank records for the Designated Account by providing Investors a personal identification number (PIN) for access to the online banking and similar electronic records made available to the Company as depositor. Notwithstanding the foregoing, Investors shall not be authorized to withdraw or transfer funds from the Designated Account. Investors may from time to time upon request review and have access to all of the Company's books and records at reasonable times at the Company's office.

7.  Costs and Expenses.  The Company shall pay all out-of-pocket costs and expenses incurred by the Company in the performance of its duties hereunder.

8.  Notice.  All notices, demands, requests, or other communications which may be or are required to be given, served or sent by any Party to any other Party pursuant to this Agreement shall be in writing and shall be hand delivered (including delivery by courier), sent by facsimile, sent by a nationally recognized overnight delivery service, or mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, addressed to the Parties' last known address or such other address as the addressee may indicate by written notice to the other Parties. Each notice, demand, request or communication that is given or made in the manner described above shall be deemed sufficiently given or made for all purposes at such time as it is delivered to the addressee (with the return receipt, the delivery receipt or the affidavit of messenger being deemed presumptive but not exclusive evidence of such delivery) or at such time as delivery is refused by the addressee upon presentation.

9.  Benefit and Assignment.  No Party may assign this Agreement without the prior written consent, duly accomplished, of the Investors and the Company.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors. No person or entity other than the Parties and their respective successors is or shall be entitled to bring any action to enforce any provision in this

2

Agreement against any of the Parties, and the covenants and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties or their respective successors.

10.   **Entire Agreement; Amendment.** This Agreement contains the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior oral or written agreements, commitments or understandings with respect to such matters. This Agreement may not be changed orally, but only by an instrument in writing signed by the Party against whom enforcement of any waiver, change, modification, extension or discharge is sought. The Parties agree to execute and deliver any and all documents and to take such further actions as shall be reasonably required to effectuate the provisions of this Agreement.

11.   **Headings.** The headings of the sections and subsections contained in this Agreement are inserted for convenience only and do not form a part of or affect the meaning, construction or scope thereof.

12.   **Governing Law; Venue.** This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California. If any California law or laws shall require or permit the application of the laws of any other jurisdiction to this Agreement, such California law or laws shall be disregarded with the effect that the remaining laws of the State of California shall nonetheless be applied. Each of the Parties hereto irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Los Angeles and Orange Counties, California over any dispute arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such court, such personal jurisdiction shall be non-exclusive.

13.   **Signature in Counterparts.** This Agreement may be executed in separate counterparts, none of which need contain the signature of all parties, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument. It shall not be necessary in making proof of this Agreement to produce or account for more than the number of counterparts containing the respective signatures of, or on behalf of, all of the parties hereto.

14.   **Attorney's Fees.** Should any action be commenced between any of the Parties concerning the matters set forth in this Agreement or the right and duties of any other Party in relation thereto, the prevailing Party in such action shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for its attorney's fees and costs.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the date and year first above written.

UMS CAPITAL GROUP LIMITED, LLC
a Connecticut limited liability company

By: *Joseph A. Mermis*
    Joseph A. Mermis
Its: Manager

R-LLC, LLC
an Idaho limited liability company

By:_____
    Keith T. Walker
Its: Authorized Representative


ULTIMATE ALLIANCE, LLC
a Nevada limited liability company

By:_____
    Robert L. Keys
Its: Manager

3

OC286,402,970v5

Agreement against any of the Parties, and the covenants and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties or their respective successors.

10.     Entire Agreement; Amendment. This Agreement contains the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior oral or written agreements, commitments or understandings with respect to such matters. This Agreement may not be changed orally, but only by an instrument in writing signed by the Party against whom enforcement of any waiver, change, modification, extension or discharge is sought. The Parties agree to execute and deliver any and all documents and to take such further actions as shall be reasonably required to effectuate the provisions of this Agreement.

11.     Headings.  The headings of the sections and subsections contained in this Agreement are inserted for convenience only and do not form a part or affect the meaning, construction or scope thereof.

12.     Governing Law; Venue.  This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California.  If any California law or laws shall require or permit the application of the laws of any other jurisdiction to this Agreement, such California law or laws shall be disregarded with the effect that the remaining laws of the State of California shall nonetheless be applied.  Each of the Parties hereto irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Los Angeles and Orange Counties, California over any dispute arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such court, such personal jurisdiction shall be non-exclusive.

13.     Signature in Counterparts.  This Agreement may be executed in separate counterparts, none of which need contain the signature of all parties, each of which shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than the number of counterparts containing the respective signatures of, or on behalf of, all of the parties hereto.

14.     Attorney's Fees.   Should any action be commenced between any of the Parties concerning the matters set forth in this Agreement or the right and duties of any other Party in relation thereto, the prevailing Party in such action shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for its attorney's fees and costs.

        IN WITNESS WHEREOF, each of the parties has caused this Agreement to be duly executed and delivered in its name and on its behalf, all as of the date and year first above written.

UMS CAPITAL GROUP LIMITED, LLC          R-LLC, LLC
a Connecticut limited liability company      an Idaho limited liability company

By:_____          By:_____
    Joseph A. Mermis                            Keith T. Walker
Its:  Manager                          Its:  Authorized Representative


                                       ULTIMATE ALLIANCE, LLC
                                       a Nevada limited liability company

                                       By:_____
                                           Robert L. Keys
                                       Its:  Manager


OC206,402,970v5                                                    3

<u>EXHIBIT "A"</u>

Bank: JP Morgan Chase Bank, N.A.

Routing Number: 322271627

Account Number: 3591136087

Name on Account:  UMS Capital Group Limited, LLC
                  dba Insurance Annuity Group, LLC

OC286,402,970v5

Exhibit B
Page 8

# EXHIBIT "C"

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of the _____ day of _____, 2009 (the "**Effective Date**"), by UMS CAPITAL GROUP LIMITED, LLC, a Connecticut limited liability company, d/b/a Insurance Annuity Group, LLC (the "**Borrower**"), and is delivered to R-LLC, LLC, an Idaho limited liability company and ULTIMATE ALLIANCE, LLC, a Nevada limited liability company (each, a "**Secured Party**" and collectively, the "**Secured Parties**").

1.      <u>Security Interest; Collateral.</u>  For value received, the Borrower hereby assigns and grants to the Secured Parties, with full recourse to the Borrower, upon and subject to the terms and conditions set forth in this Agreement, a security interest ("**Security Interest**") in and to any and all assets, tangible or intangible, including securities, financial assets, shares of stock in any companies owned in whole or part by Borrower now owned or hereafter acquired by Borrower, those assets identified on <u>Exhibit "A"</u> attached hereto, and any and all proceeds and products thereof (collectively, the "**Collateral**") to secure the "Obligations" (defined in Section 2).

2.      <u>The Obligation.</u>  The term "**Obligations**," as used herein, means all of the indebtedness, obligations and liabilities of the Borrower to each Secured Party, now existing or hereafter arising under or in respect of (a) that certain Investment Agreement dated as of the Effective Date, by and between Borrower and Secured Parties (the "**Investment Agreement**"), (b) the Operating Agreement of Insurance Annuity Group, LLC, a Connecticut limited liability company, (c) that certain Designation of Funds Agreement dated as of the Effective Date by and between Borrower and Secured Parties; or (d) this Agreement.

3.      <u>Term.</u>  The parties agree that the Security Interest hereunder shall terminate upon the earlier of (a) Borrower's satisfaction in full of the Investment Agreement or (b) expiration of fourteen months from the Effective Date; provided that as of such date (i) no Secured Party has delivered notice of exercise of redemption rights under the Investment Agreement and (ii) Borrower is not in breach of any Obligation.

4.      <u>Definitions.</u>  All capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings given them in the Connecticut Uniform Commercial Code.

5.      <u>Priority.</u>  The Borrower represents and warrants that the Security Interests are first and prior security interests in and to all of the Collateral, and there are no liens thereon or Security Interests therein on the date hereof in existence prior to the Borrower's acquisition of the Collateral.

6.      <u>Title to Collateral.</u>  The Borrower represents and warrants to each Secured Party that (a) the Borrower is the owner of the Collateral identified on <u>Exhibit "A"</u>; **(b)** no dispute, right of offset, counterclaim or defense to the Security Interests exists with respect to all or any part of the Collateral; and (c) the Borrower will defend

OC286,395,313.v5

Exhibit C
Page 9

the Collateral against the claims and demands of all persons other than any subordinate claims or liens acknowledged by such Secured Party.  Prior to the transfer of the Collateral pursuant to the exercise of any Secured Party's remedies under the UCC (as defined in Section 9 below), the Secured Parties shall have no rights as an owner of the Collateral, including the right to vote, dispose of or receive any distributions with respect to such Collateral.

7.    **Borrower's Obligations.**

7.1.    Simultaneously with the execution of this Agreement, the Borrower shall deliver to the Secured Parties all assignments or other instruments or writings evidencing any Collateral and assigned under this Agreement, together with all other assignments or endorsements requested by any Secured Party.

7.2.    If new or additional Collateral is acquired by Borrower, then the same shall be deemed an increment to the Collateral and under pledge and assignment to the Secured Parties hereunder.  If such new or additional Collateral shall be evidenced by any instrument or writing, then, to the extent that they are acquired or received by or placed under the Borrower's control, such new or additional Collateral shall be held in trust for and promptly delivered to the Secured Parties, together with any other assignments or endorsements that any Secured Party may request.

7.3.    The Borrower hereby irrevocably authorizes any Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that indicate the Collateral as all assets of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of any state.  The Borrower agrees to furnish any such information to the Secured Party promptly upon any Secured Party's request.  The Borrower also ratifies its authorization for any Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.  To further the attachment, perfection and priority of, and the ability of each Secured Party to enforce, the Secured Parties' Security Interest in the Collateral, and without limitation on the Borrower's other obligations in this Agreement, the Borrower agrees, in each case at the Borrower's expense, to take and to cause any of its affiliates with an interest in the Collateral to take, any reasonable actions necessary to perfect the Secured Parties' Security Interest in the Collateral.  Notwithstanding anything set forth herein, neither Borrower nor Secured Party shall be authorized to encumber the assets of any affiliate other than the Collateral owned by Borrower, including any affiliate who has provided collateral in connection with the issuance of Series E Units or who has provided collateral for a transaction in which Series E Units were issued.

7.4.    The Borrower covenants and agrees with each Secured Party that, so long as the Obligations remain outstanding, the Borrower shall (a) not permit any material part of the Collateral to be levied upon under any legal process; (b) not dispose of any of the Collateral without the prior written consent of the Secured Parties except in

2

*OC286,395,313.v5*

Exhibit C
Page ID

the ordinary course of Borrower's business or **(ii)** subject to the consent of the Secured Parties (which consent shall not be withheld unreasonably), the transferee of any Collateral so disposed of takes such Collateral subject to the Secured Parties' Security Interest therein under this Agreement; **(iv)** not engage in any activity to the extent that such activity would impair the ability of the Borrower to make any payment when due on the Obligations; **(v)** comply with all applicable federal, state and local statutes, laws, rules and regulations, the noncompliance with which could have a material and adverse effect on the value of the Collateral; and **(vi)** pay all taxes accruing after the date first set forth above that constitute, or may constitute, a lien against the Collateral, prior to the date when penalties or interest would attach to such taxes; provided that the Borrower may contest any such tax claim if done diligently and in good faith.

   **7.5.** Anything herein to the contrary notwithstanding, the Borrower shall remain obligated and liable under each contract or agreement comprised in the Collateral to be observed or performed by the Borrower thereunder. The Secured Parties shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by any Secured Party of any payment relating to any of the Collateral, nor shall any Secured Party be obligated in any manner to perform any of the obligations of the Borrower under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by any Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to any Secured Party or to which any Secured Party may be entitled at any time or times other than those required by the borrower.

   **7.6.** The Borrower shall, at the request and option of any Secured Party, notify account grantors and other persons obligated on any of the Collateral of the security interest of the Secured Parties in any Collateral and that payment thereof is to be made directly to the Secured Parties or to any financial institution designated by the Secured Parties as the Secured Parties' agent therefor, and any Secured Party may itself, without notice to or demand upon the Borrower, so notify account grantors and other persons obligated on Collateral only after there has been a clear default by borrower.

   **8.**  <u>Event of Default</u>. As used herein, the term "**Event of Default**" shall include nonpayment on the Obligations if the same exist and remain uncorrected on the 10th day after written notice by any Secured Party to the Borrower that certifies such default, or any one of the following:

     **(a)** the assignment, voluntary or involuntary conveyance of legal or beneficial interest, mortgage, pledge or grant of a Security Interest in any of the Collateral;

     **(b)** the filing or issuance of a notice of any lien, warrant for distraint or notice of levy for taxes or assessment against the Collateral (except for

3

OC286,395,313.v5

Exhibit C
Page 11

those that are being contested in good faith and for which adequate reserves have been created); or

     (c) the entry of an order for relief as to the Borrower under the United States Bankruptcy Code, Title 11 of the United States Code, whether arising in connection with voluntary or involuntary bankruptcy proceedings.

  9. **Remedies.** Upon the occurrence and during the continuation of an Event of Default as defined herein, the Secured Party, at its option, may exercise any and all rights and remedies that the Secured Party may then have hereunder, under the Line of Credit Agreement or under the Uniform Commercial Code of Connecticut or of any other applicable jurisdiction (the "**UCC**"). All rights and remedies of each Secured Party and the Secured Parties shall be deemed joint and several and may be enforced by any or all Secured Parties jointly or severally.

  10. **Application of Proceeds by Secured Party.** Any and all proceeds ever received by any Secured Party from any sale or other disposition of the Collateral, or any part thereof, or the exercise of any other remedy pursuant hereto shall be applied by such Secured Party toward satisfaction of the Obligations; provided that any proceeds received by any Secured Party under this Agreement in excess of those necessary to fully and completely satisfy all of the Obligations shall be distributed to the Borrower.

  11. **Notice of Sale.** Reasonable notification of the time and place of any public sale of the Collateral, or reasonable notification of the time after which any private sale or other intended disposition of the Collateral is to be made, shall be sent to the Borrower and to any other persons entitled under the UCC to notice; provided that if any of the Collateral threatens to decline speedily in value or is of a kind customarily sold on a recognized market, any Secured Party may sell, pledge, assign or otherwise dispose of the Collateral without notification, advertisement or other notice of any kind. It is agreed that notice sent or given not less than ten (10) calendar days prior to the taking of the action to which the notice relates is reasonable notification and notice for the purpose of this section.

  12. **Delivery of Notices.** Any notice or demand required to be given hereunder shall be in writing and shall be deemed to have been duly given and received, if given by hand, when a writing containing such notice is received by the person to whom addressed or, if given by mail, five (5) business days after a certified or registered letter containing such notice, with postage prepaid, is deposited in the United States mails, addressed to:

    If to Secured Parties:   Robert Keys
              ULTIMATE ALLIANCE, LLC
              1550 NW Eastman Parkway, Suite 150
              Gresham, Oregon 97030

Exhibit C
Page 12

Keith T. Walker
R-LLC, LLC
1070 Riverwalk Drive, Suite 200
Idaho Falls, Idaho 83402

If to Borrower:              INSURANCE ANNUITY GROUP, LLC
                             102 Wolcott Road, Suite G
                             Wolcott, Connecticut  06716

Any such address may be changed from time to time by serving notice to the other party as above provided. A business day shall mean a day of the week that is not a Saturday or Sunday or a holiday recognized by national banking associations.

    **13.**    **Binding Effect.** This Agreement shall be binding upon the Borrower and the successors and assigns of the Borrower, and shall inure to the benefit of each Secured Party and the heirs, successors, assigns, executors, administrators and personal or legal representatives of such Secured Party.

    **14.**    **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California.  If any California law or laws shall require or permit the application of the laws of any other jurisdiction to this Agreement, such California law or laws shall be disregarded with the effect that the remaining laws of the State of California shall nonetheless be applied. Each of the parties hereto irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Los Angeles and Orange Counties, California over any dispute arising out of or relating to this Agreement, except that in actions seeking to enforce any order or any judgment of such court, such personal jurisdiction shall be non-exclusive.

    **15.**    **Severability.**  In the event that any one or more of the provisions contained in this Agreement are held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

    **16.**    **Amendment and Waiver.**  No term of this Agreement may be amended and no observance of any term of this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely), without the written consent of the party against which such amendment or waiver is sought to be enforced.

    **17.**    **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one instrument.

5

OC286,395,313.v5

Exhibit C
Page 13

**IN WITNESS WHEREOF,** the Borrower and each Secured Party have executed this Agreement as of the day and year first hereinabove set forth.

UMS CAPITAL GROUP LIMITED, LLC,
a Connecticut limited liability company

By: _____
    Joseph A. Mermis
Its: Manager

R-LLC, LLC,
an Idaho limited liability company

By: _____
    Keith T. Walker
Its: Authorized Representative

ULTIMATE ALLIANCE, LLC,
a Nevada limited liability company

By: _____
    Robert L. Keys
Its: Manager

OC286,395,313.v5

6

Exhibit C
Page 14

IN WITNESS WHEREOF, the Borrower and each Secured Party have executed this Agreement as of the day and year first hereinabove set forth.

UMS CAPITAL GROUP LIMITED, LLC,
a Connecticut limited liability company

By:_____
      Joseph A. Mermis
Its: Manager

R-LLC, LLC,
an Idaho limited liability company

By:_____
      Keith T. Walker
Its: Authorized Representative


ULTIMATE ALLIANCE, LLC,
a Nevada limited liability company

By:_____
      Robert L. Keys
Its:  Manager

*OC286,395,313.v5*

6

Exhibit C
Page 15

EXHIBIT "A"

Collateral

1.  Insurance Annuity Group, LLC (IAG) Asset Collateral Agreement, dated March 27, 2009, by and between UMS Capital Group Limited, LLC, a Connecticut limited liability company d/b/a Insurance Annuity Group, LLC, a Connecticut limited liability company, and BMX, LLC, a Nevada Limited Liability Company, and joined by X. O. Barrios, M.D., as amended by that certain Series E Amendment for Series A Investors, executed by Snowy Range Business Trust and Insurance Annuity Group, LLC (the "Collateral Agreement").

2.  Assignment of Interest between C. M. Salazar, Trustee for the Snowy Range Business Trust and BMX, LLC, a Nevada limited liability company, dated March 27, 2009 to the extent necessary to implement the Asset Collateral Agreement as set forth in paragraph 1.

3.  That certain real property together with improvements, if any, situate, lying and being in the County of CARBON, and the state of Wyoming and described as follows:

Lode Mining Claim-Snowy Range WMC #15 BLM Serial No. WMC 280278 Located in the NW1/4 of Section 13 - Township 15 North-Range 80 West, 6th PM Carbon County, Wyoming;

To the extent necessary to implement the Asset Collateral Agreement as set forth in paragraph 1.

4.  Agreement to Engage in Mining Operations, dated April 30, 2009, by and between BMX, LLC and Snowy Range Business trust to the extent necessary to implement the Asset Collateral Agreement as set forth in paragraph 1.

5.  IAG Collateral Asset Account, identified in the Collateral Agreement.

OC286,395,313.v5

Exhibit C
Page 16

# EXHIBIT "D"



# INSURANCE ANNUITY GROUP
102 Wolcott Road, Suite G
Wolcott, Connecticut 06716

July 7, 2009

Roland Walker
McNeil Development, LLC
1070 Riverwalk Dr. Suite 200
Idaho Falls, ID 83402
rollie@ida.net

Fred Townsend
Townsend Insurance Investments, LLC
11 Cole Road
Wolcott, CT 06716

Robert Keys
Keys Business Group
1550 NW Eastman Parkway, Ste. 150
Gresham, OR 97030
Bkeys@keysbusinessgroup.com

Re:     **Letter Agreement Re Early Release of Roland Walker Funds to IAG**

Dear Messrs. Walker, Keys and Townsend:

This letter will set forth the terms of a multi-party agreement by and among Insurance Annuity Group, LLC, a.k.a., UMS Capital Group, LLC ("IAG"), Joe Mermis, Fred Townsend, Roland Walker and Robert Keys with respect to release and transfer of funds by Roland Walker or an affiliated limited liability company ("Walker") dedicated to the purchase of a Series A membership interest in IAG (the terms of which purchase are set forth more particularly in the subscription and related agreements executed prior to the date hereof by and between IAG and Walker).

In consideration of the mutual covenants and agreements contained herein, the parties agree as follows:

1.      **Exchange of Executed IAG Subscription Documents and Release of Funds to IAG:** Walker hereby agrees to authorize his counsel, Greenberg & Traurig to release to IAG, in care of its counsel, Horwitz, Cron & Jasper, P.L.C. ("Horwitz") his executed subscription documents for the purchase of a Series A membership interest in IAG and transfer the sum of $2,300,000 to the client trust account of Horwitz, in exchange for Horwitz's delivery to Greenberg & Traurig, IAG's executed subscription documents, within one business day following execution of this letter agreement. The use of the funds will be subject to the following terms and conditions:

2.      **Transfer of Funds to IAG Account:** IAG will cause Horwitz to transfer the $2,300,000 to a bank account established in the name of IAG in the State of Connecticutt. The sole, authorized signatory on this IAG account will be Joe Mermis. In the event that Joe Mermis is incapacitated, IAG will authorize Fred Townsend to become the signatory on this account and the person authorized to transfer funds from this account. Joe Mermis will provide written notice to Walker of the name and address of the bank, account number, and the name of a bank officer who will be authorized to confirm that the account has been established in the name of IAG with Joe Mermis as signatory. IAG may transfer the funds from this account only for authorized uses as set forth herein.

Messrs. Walker, Keys, Townsend
July 7, 2009
Page 2

3.    **Authorized Uses of Funds:**   IAG, Joe Mermis and Fred Townsend agree that disbursements from the IAG account will be made only for the following:

> (1) Acquisition of the Workmen's Life Insurance Company, an Arizona life insurance company;
> (2) Start Up Operating Expenses of IAG, including but not limited to hiring or retaining  an actuary, consultant, board members and other necessary expenses for the start of operations

Joe Mermis and IAG agree to provide Roland Walker with a written, itemized budget for the disbursement of funds from the account.   A copy of the disbursement schedule is attached. Joe Mermis will provide a  breakdown for the actual disbursements at the end of each month for the next three  months. The breakdown will contain the names of the payees, and a description of the item purchased or service performed.  Upon request of Roland Walker, Joe Mermis /IAG agree to provide Roland Walker with source documents evidencing the obligation or expense, such as an invoice or contract etc..

4.    **Robert Keys to Transfer Funds to IAG by July 17, 2009:**   For and in consideration of Walker's agreement to release funds to IAG as set forth herein, Robert Keys agrees to transfer or  cause the transfer of $2,500,000 to IAG on or before July 17, 2009 for purchase of a Series A membership interest.  Robert Keys further represents to all parties that he will have sufficient cash funds available by such date to complete the acquisition of the Series A membership interest and promises to take all necessary and prudent steps required to assure his availability of funds on or before July 17, 2009 so that IAG will have adequate operating capital for its operations.

5.     **Subscription Agreement and all Related Agreements to Remain in Force and Effect:**  This letter agreement for an early release of funds to IAG prior to close of the offering of membership interests in IAG shall not supercede or replace any other written agreements by  or among the parties, which agreements shall remain in full force and effect.

If you have any questions on the above, please do not hesitate to contact the undersigned.

Sincerely,

**Insurance Annuity Group, LLC**

_Joe Mermis_

Joe Mermis, Managing Member

READ, ACCEPTED AND AGREED TO THIS 7TH DAY OF JULY, 2009

_Joe Mermis_

_____          JOE MERMIS
ROLAND WALKER

_____          _____
ROBERT KEYS                               FRED TOWNSEND

Copyright 2009.  All rights reserved.  Unauthorized duplication is a violation of applicable laws.  IAG is a trademark of Insurance Annuity Group.

Exhibit D
Page 19

Messrs. Walker, Keys, Townsend
July 7, 2009
Page 2

3. **Authorized Uses of Funds:** IAG, Joe Mermis and Fred Townsend agree that disbursements from the IAG account will be made only for the following:

> (1) Acquisition of the Workmen's Life Insurance Company, an Arizona life insurance company;
> (2) Start Up Operating Expenses of IAG, including but not limited to hiring or retaining an actuary, consultant, board members and other necessary expenses for the start of operations

Joe Mermis and IAG agree to provide Roland Walker with a written, itemized budget for the disbursement of funds from the account. A copy of the disbursement schedule is attached. Joe Mermis will provide a breakdown for the actual disbursements at the end of each month for the next three months. The breakdown will contain the names of the payees, and a description of the item purchased or service performed. Upon request of Roland Walker, Joe Mermis /IAG agree to provide Roland Walker with source documents evidencing the obligation or expense, such as an invoice or contract etc.,

4. **Robert Keys to Transfer Funds to IAG by July 17, 2009:** For and in consideration of Walker's agreement to release funds to IAG as set forth herein, Robert Keys agrees to transfer or cause the transfer of $2,500,000 to IAG on or before July 17, 2009 for purchase of a Series A membership interest. Robert Keys further represents to all parties that he will have sufficient cash funds available by such date to complete the acquisition of the Series A membership interest and promises to take all necessary and prudent steps required to assure his availability of funds on or before July 17, 2009 so that IAG will have adequate operating capital for its operations.

5. **Subscription Agreement and all Related Agreements to Remain in Force and Effect:** This letter agreement for an early release of funds to IAG prior to close of the offering of membership interests in IAG shall not supercede or replace any other written agreements by or among the parties, which agreements shall remain in full force and effect.

> If you have any questions on the above, please do not hesitate to contact the undersigned.

Sincerely,

**Insurance Annuity Group, LLC**

Joe Mermis, Managing Member

READ, ACCEPTED AND AGREED TO THIS 7TH DAY OF JULY, 2009

ROLAND WALKER

JOE MERMIS

ROBERT KEYS

FRED TOWNSEND

Copyright 2009. All rights reserved. Unauthorized duplication is a violation of applicable laws. IAG is a trademark of Insurance Annuity Group.

Messrs. Walker, Keys, Townsend
July 7, 2009
Page 2

3.     **Authorized Uses of Funds:**   IAG, Joe Mermis and Fred Townsend agree that disbursements from the
IAG account will be made only for the following:

        (1) Acquisition of the  Workmen's Life Insurance Company, an Arizona life insurance company;
        (2) Start Up Operating Expenses of IAG, including but not limited to hiring or retaining  an actuary,
consultant, board members and other necessary expenses for the start of operations

Joe Mermis and IAG agree to provide Roland Walker with a written,  itemized budget for the disbursement of funds
from the account.   A copy of the disbursement schedule is attached. Joe Mermis will provide a  breakdown for the
actual disbursements at the end of each month for the next three  months. The breakdown will contain the names
of the payees, and a description of the item purchased or service performed.  Upon request of Roland Walker, Joe
Mermis /IAG agree to provide Roland Walker with source documents evidencing the obligation or expense, such as
an invoice or contract etc..

4.     **Robert Keys to Transfer Funds to IAG by July 17, 2009:**   For and in consideration of Walker's
agreement to release funds to IAG as set forth herein, Robert Keys agrees to transfer or  cause the transfer of
$2,500,000 to IAG on or before July 17, 2009 for purchase of a Series A membership interest.  Robert Keys further
represents to all parties that he will have sufficient cash funds available by such date to complete the acquisition of
the Series A membership interest and promises to take all necessary and prudent steps required to assure his
availability of funds on or before July 17, 2009 so that IAG will have adequate operating capital for its operations.

5.     **Subscription Agreement and all Related Agreements to Remain in Force and Effect:**   This
letter agreement for an early release of funds to IAG prior to close of the offering of membership interests in IAG
shall not supercede or replace any other written agreements by  or among the parties, which agreements shall
remain in full force and effect.

        If you have any questions on the above, please do not hesitate to contact the undersigned.

                                        Sincerely,

                                **Insurance Annuity Group, LLC**


                                _____
                                Joe Mermis, Managing Member



READ, ACCEPTED AND AGREED TO THIS 7TH DAY OF JULY, 2009

_____         _____
ROLAND WALKER                           JOE MERMIS


_____         _____
ROBERT KEYS                             FRED TOWNSEND




Copyright 2009.  All rights reserved.  Unauthorized duplication is a violation of applicable laws.  IAG is a trademark of
Insurance Annuity Group.

· ·From:FICC                          901 507 9056          07/08/2009 10:50      #094 P.002/002
· 07/07/2009 17:23      714-544-2307         Gregory Grantham, Esq.                       Page 3/3

Messrs. Walker, Keys, Townsend
July 7, 2009
Page 2

3.      **Authorized Uses of Funds:**  IAG, Joe Mermis and Fred Townsend agree that disbursements from the
IAG account  will be made only for the following:

(1) Acquisition of the  Workmen's Life Insurance Company, an Arizona life insurance company;
(2) Start Up Operating Expenses of IAG, including but not limited to hiring or retaining  an actuary,
consultant, board members and other necessary expenses for the start of operations

Joe Mermis and IAG agree to provide Roland Walker with a written,  itemized budget for the disbursement of funds
from the account.   A copy of the disbursement schedule is attached. Joe Mermis will provide a  breakdown for the
actual disbursements at the end of each month for the next three  months. The breakdown will contain the names
of the payees, and a  description of the item purchased or service performed.  Upon request of Roland Walker, Joe
Mermis /IAG agree to provide Roland Walker with source documents evidencing the obligation or expense, such as
an invoice or contract etc..

4.      **Robert Keys to Transfer Funds to IAG by July 17, 2009:**  For and in consideration of Walker's
agreement to release funds to IAG as set forth herein, Robert Keys  agrees to transfer or   cause the transfer of
$2,500,000 to IAG on or before July 17, 2009 for purchase of a Series A membership interest.  Robert Keys further
represents to all parties that he will have sufficient cash funds available by such date to complete the acquisition of
the Series A membership interest and promises to take all necessary and prudent steps required to assure his
availability of funds on or before July 17, 2009 so that IAG will have adequate operating capital for its operations.

5.      **Subscription Agreement and all Related Agreements to Remain in Force and Effect:**  This
letter agreement for an early release of funds to IAG prior to close of the offering of membership interests in IAG
shall not supercede or replace any other written agreements by   or among the parties, which agreements shall
remain in full force and effect.

If you have any questions on the above, please do not hesitate to contact the undersigned.

Sincerely,

**Insurance Annuity Group, LLC**

_____
Joe Mermis, Managing Member

READ, ACCEPTED AND AGREED TO THIS 7TH DAY OF JULY, 2009

ROLAND WALKER _____            JOE MERMIS _____

_____
ROBERT KEYS                                         FRED TOWNSEND _____

Copyright 2009.  All rights reserved.  Unauthorized duplication is a violation of applicable laws.  IAG is a trademark of
Insurance Annuity Group.

Received Time Jul. 7.   7:23PM

### IAG PRO FORMA BUDGET

Due to the fact that IAG will initially have fewer funds that anticipated, it plans to narrow focus to things necessary to be qualified to accept annuity assets and fund the Walker Family Real Estate Projects Loans. This requires purchase of an insurance company, qualification of its controlling personnel (FORM A). Next IAG will concentrate on the securing of annuity assets and support of same by Series E capital. IAG is allocating $2,000,000 to this aspect. This is the strategic plan and priority. Any thing not directly related to this result has a priority that is secondary.

That leaves $300,000 for logistics, consultants, overhead, travel, etc. This can go very rapidly. As a result, IAGT will have to stick to priorities. Insurance marketing, real estate loan marketing, and the overhead associated with these endeavors have to wait until the remaining funds are available. IAG will need a single-minded focus on doing those things necessary to the strategic objective to being legally qualified to fund the Walker Family loans as soon as possible. The following is a schedule of the anticipated timing and uses of funds:

| | |
|---|---|
| Week 1. | Complete acquisition contract of WLIC. |
| Week 2. | Close acquisition of WLIC. (Appx. $1.5 - $2.0 Million) Complete and submit Form A to AZ Life Insurance Commission. |
| Week 3. | Fred and Joe will start seeking blocks of annuities to acquire. (Budget for minimal start up of operations: $300,0000 – breakdown to be provided at end of each month) |
| Week 4. | Make decisions on a President for WLIC and a Board of Directors. |
| Week 5. | Bring $20,000,000 million in collateral to Holding Company (IAG). |
| Week 6. | If AZ approves Form A in their historical time of 30 days, IAG will downstream $20,000,000 in surplus bonds backed by $20,000,000 in collateral. WLIC can then support $200,000,000 to $400,000,000 in annuity assets. |
| Week 7. | WLIC will start closing annuity assets onto the company's balance sheet. |
| Week 8. | Start participation activities for loans to Walker family. |

Exhibit D
Page 27